[No. B037251. Second Dist., Div. One. Dec. 21, 1989.]

BIXEL ASSOCIATES, Plaintiff, Cross-defendant and Appellant, v. CITY OF LOS ANGELES et al., Defendants, Cross-complainants and Respondents.

COUNSEL

Greenberg, Glusker, Fields, Claman & Machtinger, Norman H. Levine and Kathleen A. O'Brien for Plaintiff, Cross-defendant and Appellant.

James K. Hahn, City Attorney, Claudia McGee Henry, Assistant City Attorney, Sharon Siedorf Cardenas, Robert N. Kwong and Thomas A. Kathe, Deputy City Attorneys, for Defendants, Cross-complainants and Respondents.

OPINION

HANSON, J.—Plaintiff Bixel Associates, a partnership (hereinafter Bixel), filed a complaint seeking refund of a fire hydrant fee of $135,520 from the named defendants, the City of Los Angeles and its department of building and safety (hereinafter City). City answered plaintiff's complaint and filed a cross-complaint for declaratory relief.

After discovery, both parties made motions for summary judgment. Upon conclusion of the hearing on the motions, the trial court took the matter under submission and ultimately awarded summary judgment to City. Plaintiff Bixel has filed a timely appeal. The parties agreed to proceed in this court by filing a joint appendix in lieu of clerk's transcript, pursuant to California Rules of Court, rule 5.1.

### INTRODUCTION

Plaintiff Bixel is the developer of the Transpacific Center, a 32-story office building at 1055 West 7th Street, in Los Angeles. The building has 586,884

square feet and a maximum occupancy of 5,869 persons, as well as parking for 1,178 cars. More than $1 million is being spent by the developer for an internal system of fire protection. The building permit was obtained from City for construction at a cost to the developer of $136,184.40, based on the $61.6 million total value assigned to the construction work. The developer also paid plan check fees of $97,798.20 and $17,958.54, for a total of $251,941.14. In addition, pursuant to Los Angeles Municipal Ordinance No. 160086 and as a condition of the issuance of the building permit, plaintiff Bixel's predecessor in interest was required to pay a fire hydrant fee of $135,520, representing .022 percent of the value of the work subject to the building permit fee.

The fire hydrant fee was paid under protest on March 20, 1986, and a claim for refund was made to the City on June 20, 1986. City neither granted nor denied the claim, and accordingly the claim was deemed rejected by City. (L.A. City Charter, § 363.) This action was then filed in the superior court.

To clarify the factual presentation, we explain that at issue is the constitutionality of the fire hydrant fee exacted from center's developer, a fee which was established by the enactment of two city ordinances, Ordinance No. 160086 and No. 160087 (the Fire Hydrant Fee Ordinances). The constitutionality of the fee has been challenged as violative of article XIII A, section 4 of the California Constitution, certain sections of the Government Code enacted to implement articles XIII A and XIII B (constitutional amendments enacted by the voters and commonly known as Proposition 13), and the due process guarantees of both the federal and state Constitutions.

Article XIII A, section 4 of the California Constitution bars entities such as City from imposing "special taxes" unless they are approved by a vote of two-thirds of the electorate. However, there is an exception to the rule: local entities such as City, in the exercise of police power, may constitutionally impose "development" fees, which are not regarded as "special taxes" but are designed to compensate the public for any increased burden on public services which can reasonably be attributed to the new development in question. The fee imposed must *"not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."* (Gov. Code, § 50076, Stats. 1979, ch. 903, § 1, italics added; see also *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496 [246 Cal.Rptr. 21], partially published as directed by the Cal. Supreme Court.)

Factual Summary

From the record made in the trial court and presented to us here, we glean the following: Prior to the enactment of the Fire Hydrant Fee Ordinances, the entire cost of the installation of fire hydrants and upgrading of water mains attributable to a new development project such as Bixel's building in the City was paid by the developer, rather than from the City's General Fund. When a developer sought a building permit for a new project, City required the developer to submit its plans to the City's fire department for review pursuant to the City's fire protection and prevention plan to determine the necessary fire hydrant and water main improvements to service the proposed project.

The plan referred to above specifies the minimum spacing between fire hydrants and the minimum water supply which must be available to the hydrants based on the estimated intensity and density of the particular area under review. Where additional hydrants and other changes were determined necessary, City's fire department would advise City's department of water and power (DWP). The DWP would estimate the cost of installing additional fire hydrants, water mains, etc., and would require the developer to provide the sums needed to service his project.

This method of financing has been utilized in the past not only in Los Angeles but also in many other cities. It has not been considered equitable because it placed a heavy burden on the first developer in a new area; often while a heavy burden was placed on the first developer, others who subsequently received the benefit of the increased services in a particular area did not bear an equal share of the cost.

Between 1974 and 1978, City's council conducted numerous studies and hearings to create a more equitable method of funding fire hydrants and mains to service new development. The council's efforts were not only favored by the large developers but by smaller entities—churches, schools and small developers—who were hard-pressed to bear the individual cost of the hydrants and water mains sometimes necessitated by their relatively inexpensive projects. In 1978, the voters enacted the initiative commonly known as Proposition 13, which, by constitutional amendment, placed very substantial limitations on the taxing powers of local governmental entities.

In 1984 and 1985, at the council's request, the City's administrative office (CAO) made reports to council that ultimately formed the basis for the Fire Hydrant Fee Ordinances method of financing. Taking the year 1983 as a

year of normal building activity in the City (i.e., the so-called "snapshot" year), the determination was made, according to the declaration of Maria Nixon, a senior administrative analyst for City, that $4,288,620 had been spent in the City for fire hydrants and water main improvements. Taking this annual cost and dividing it by the total value of work authorized by the building permits from 1982 to 1984, an average resulting annual percentage was determined.

It is this percentage—ultimately placed at .022 percent (after excluding developments valued at under $50,000)—applied to the value of a proposed development—which determined the fire hydrant fee collected by the City from Bixel. In this manner it was intended that the cost of providing new services would be spread among all new developers; the fire hydrant fees collected from developers are placed in a fund separate and apart from general City revenues. City offered evidence by the affidavit of City Fire Inspector Charles Justis, in support of its motion for summary judgment, that all monies from the fund were being spent in a manner consistent with the City's fire protection and prevention plan.

The City council decided, during the course of this effort to change the existing financing method, to exempt any development where the total value of the work was under $50,000 because of the limited impact such projects historically have had on the fire hydrant and water main system, and the relatively heavy individual burden imposing the fee would place on small projects; statistically, it appears that while 85 percent of the building permits issued annually by City are for projects valued at less than $50,000 they comprise *only* 15 percent of the total *value* of the work for which building permits are annually issued. After public hearings, the Fire Hydrant Fee Ordinances were adopted by the City council on June 28, 1985. Voter approval was not sought for the new financing scheme.

The ordinances added section 91.0204(h) to the Los Angeles Municipal Code. This section provides for the collection of the fire hydrant fee by the department of building and safety on projects for which a building permit is issued and which exceed $50,000 in value. The section provides that the fee to be imposed is .022 percent of the value of the project as reflected in the building permit.

It contains the following language: "The Department of Building and Safety shall cause all money collected . . . to be deposited into the 'Fire Hydrant Installation and Main Replacement Fund' described in Section 5.114 of the Los Angeles Administrative Code *for purposes of disbursement as permitted therein*. . . ." (Italics added.)

Section 5.114 of the Los Angeles Administrative Code, in turn, provides that the money collected by the Fund is for use in *"the initial installation of fire hydrants, fire hydrant upgrades, and upgrades, improvements or replacements of existing water mains consistent with the Safety Plan and Fire Protection Plan elements of the General Plan. The relocation of fire hydrants due to street improvements is not to be paid from the Fund."* (Italics added.)

Our record contains the fire protection and prevention plan, but not the safety plan mentioned in the administrative code section. The fire protection and prevention plan, identified as part of the City's general plan, is itself very general in scope, and contains no specific directives concerning limitations placed on the expenditure of funds from the fire hydrant fund; City offered the Justis declaration referred to above, wherein Justis declared that "[t]he Fire Department Hydrant Unit is responsible for administering the funds collected from the fire hydrant fee which are placed in the Fire Hydrant Installation and Main Replacement Fund. Monies are transferred out of this Fund upon request by the Fire Department. Since the creation of the Fund by the Ordinances, all monies from the Fund have been expended *only* for the initial installation of fire hydrants, fire hydrant upgrades, and upgrades, improvements or replacements of existing water mains consistent with the City's Fire Protection Plan. The above-referenced fire suppression improvements paid for out of the Fund represent hydrant and main installations and replacements required to offset the additional fire burden generated by new development. A separate Capital Improvement Expenditure Program funded by the City's General Fund is used to fund general-benefit capital improvement projects and *maintenance* projects generated by existing customers in the City." (Italics in text.)

The record also contains the information that the fire department and the DWP determined that the presence of Bixel's building would require two new fire hydrants at a cost of $16,800. This cost was mentioned by City in its answers to interrogatories directed to it by plaintiff Bixel. At some later time in this litigation City advised the trial court that after a fire at the Interstate Bank building in May 1988, the fire department decided that it would be necessary to upgrade 1,400 feet of a 24-inch water main on 7th Street to properly service and protect Bixel's office building at an estimated cost of $994,000, for a total projected cost of $1,010,800. Interrogatories by plaintiff Bixel to City, however, established that there was no precise plan to upgrade the water main, that it would be replaced eventually by a main which was also 24 inches, and that the present main was 97 years old and should have been replaced 47 years ago.

The record also contains, among the materials discovered by plaintiff Bixel, a prophetic letter addressed to the City attorney by the general

manager of the City Building and Safety Department, Frank V. Kroeger, on May 9, 1985, during the administrative efforts to revise the financing system. In it, Mr. Kroeger noted that the new financial structure, the proposed "fee" method which ultimately became law, had the potential of violating the California Constitution as amended by Proposition 13. He correctly pointed out that any financing scheme must, according to current case law on the subject, provide for a fee which "does not exceed the reasonable cost of providing the service for which the fee is charged *and* the basis for determining the amount of the fee allocated to the permittee bears a fair and reasonable relation to the permittee's benefit from the fee. The burden of demonstrating this relationship is basically upon the party establishing the fee." Mr. Kroeger's concerns were not addressed in subsequent communications, a fact he mentioned in a later letter to the City attorney dated June 14, 1985, shortly before the ordinances were enacted. As indicated, the ordinances were enacted with little change after Kroeger saw them, and when City imposed the fire hydrant fee on Bixel, this litigation ensued challenging the ordinances' constitutionality.

## STANDARD OF REVIEW

We first address the standard of review which governed the trial court's consideration of this matter. City has argued during these appellate proceedings that summary judgment was awarded below in the exercise of the trial court's discretion—which we should not disturb. This does not accurately describe the standard employed below or here.

The trial court was considering the summary judgment motions of both of the parties. Summary judgment procedure is set forth in Code of Civil Procedure section 437c. That statute provides, in pertinent part, that "[a]ny party may move for summary judgment . . . if it is contended that the action has no merit or that there is no defense thereto." Subdivision (c) states that "[t]he motion for summary judgment *shall* be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Italics added.) Thus discretion is not involved; a party who has established a right to summary judgment is entitled to it as a matter of law.

Since the grant of summary judgment bars the party against whom it is awarded from trial on the merits, it is deemed a drastic procedure. It has long been established that the trial court must construe a moving party's affidavits strictly, an opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.

(*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

 In addition to the burden placed upon it by summary judgment procedure, City, in seeking summary judgment, had an additional burden below. As was explained in *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1983) 165 Cal.App.3d 227, 235 [211 Cal.Rptr. 567], "[t]he purpose of Proposition 13 being to impose a broad constitutional restriction on the power of local agencies to impose 'special taxes,' subject to the limited statutory exception contained in Government Code section 50076, it rightfully follows that *the local agency which seeks to avoid the general rule should have the burden of establishing that it fits the exception.*" (Italics added.) City has also maintained on this appeal that the burden of proof was upon plaintiff Bixel as the party seeking to avoid imposition of the fire hydrant fee. *Beaumont* holds otherwise, and we follow it.

The primary issues in the case at bench were questions of law. Whether the fire hydrant fee was a development fee or a "special tax" was such a question. (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d 1496, 1504.) The interpretation and application of ordinances, like statutes, also raise primarily legal issues. These matters are peculiarly the province of an appellate court, which conducts independent review under these circumstances. As to the facts presented to the trial court on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].) Thus we review the summary judgment granted below without deference to the trial court's determination.

### CONTENTIONS RAISED ON APPEAL

Plaintiff Bixel contends that (1) the ordinances establishing the fire hydrant fee and fund violate Government Code section 54990 because they seek to charge new development for all fire hydrant and water main installations and replacements citywide; that the method employed for determining the amount of the fee was constitutionally impermissible; (2) because the fire hydrant fee imposed by the ordinances exceeds the reasonable cost of the services for which it is charged, the fee is an invalid "special tax," pursuant to article XIII A of the California Constitution; plaintiff asserts that there are no legally stated limits placed upon the use by the City of the funds collected pursuant to the ordinances; (3) because the fee charges developers for public needs in excess of those created by the development, it is an uncompensated taking in violation of the Fifth Amendment, United

States Constitution and article I, section 19, of the California Constitution; (4) the grant of summary judgment was erroneous because City failed to make the factual showing necessary to support its motion.

Plaintiff also addresses a statute of limitations issue the trial court explicitly *excluded* as a grounds for its decision, in the minute order in which it announced its ruling. Plaintiff has also abandoned an argument that the ordinances established a financing scheme which violated the equal protection of the laws guaranteed by both the federal and state Constitutions.

After this court had reviewed the materials contained in the joint appendix, studied the briefs and heard oral argument in this matter, a notice was sent to the parties asking them to brief in greater depth two issues: (1) whether or not the *method* employed by the City for determining the amount of the fire hydrant fee imposed on plaintiff met the standards set by the California Constitution, article XIII A, section 4, and by pertinent Government Code sections; and (2) whether or not the Fire Hydrant Fee Ordinances were overly broad or either expressly or by interpretation contained the limitations set by California Constitution, article XIII A, section 4, and by pertinent Government Code sections.

We did receive additional briefing. City's brief contained evidentiary materials that had not been presented to the trial court, and we disregard them here. City's brief concentrated, as it has throughout this litigation, on the legislative history of the ordinances, showing City's intent to rectify the inequitable situation which prevailed prior to the ordinances. While it is laudable that City made this effort, and evident that as high a level as possible of protective services, including fire protection, should be provided for the public, such services have to be provided within the constitutional framework.

Much of the documentation offered by City failed to address how the fire hydrant fee met the basic constitutional requirement. In response to our request for answers to the two questions, City responded with irrelevant or improper material and nonresponsive argument. It repeatedly asserted that the fire hydrant fees were created from new development for new development. This assertion has little support in the record before us.

In the next section we will briefly discuss the two questions we asked the parties after oral argument, because in our view those two questions, adequately answered, resolve this litigation.

DISCUSSION

I.

California Constitution, article XIII A, section 4, provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

Government Code section 50076 refers to "special taxes" as follows: "As used in this article, 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."

Government Code section 54990 provides, in pertinent part, that "[n]otwithstanding any other provision of law, when a local agency charges fees for zoning variances; zoning changes; use permits; building inspections; *building permits*; . . . those fees shall not exceed the estimated reasonable cost of providing the service for which the fee is charged, unless a question regarding the amount of the fee charged in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue." (Italics added.)

It is uncontroverted in the case at bench that City exacted the fire hydrant fee from plaintiff Bixel as a condition of issuing the building permit, and that the fee had not been submitted to the voters for approval.

 There is considerable case law that explains, much as City's building department head Kroeger tried to explain to the City attorney, that for a development fee such as City's fire hydrant fee to avoid invalidation as a special tax imposed without voter approval, *it must not exceed the reasonable cost of providing the service for which the fee is charged, and the basis for determining the amount of the fee allocated to the developer must bear a fair and reasonable relation to the developer's benefit from the fee.* (See, e.g., *Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412 [194 Cal.Rptr. 357, 668 P.2d 664]; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d 1496; *J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745 [203 Cal.Rptr. 580]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d

227.) In order for City to obtain summary judgment on the constitutional validity of this financing scheme, City needed to persuasively demonstrate compliance with the criteria set forth above. We now examine the method City used to arrive at the fee, and the ordinances City drafted to establish the fee and the separate fund for such fees as collected.

## II.

The declaration of Maria Nixon, City's senior administrative analyst, offered by City in support of summary judgment, established that one of the figures in the formula used to arrive at the .022 percent was an average annual cost of "fire hydrants and water main replacements." It may be recalled that the average annual cost referred to above was divided by the total value of permits during the same time period to obtain the percentage.

■ As plaintiff Bixel argued from the outset of this litigation, the record did *not* establish that the "average annual cost" figure exclusively reflected the cost of *new development;* the Nixon declaration fell far short of doing this. For that reason no reasonable basis for imposing the "percentage" on new developers was demonstrated by City. City was not entitled to summary judgment because City did not show that the method used to determine the amount of the fire hydrant fee bore a fair and reasonable relation to the developer's benefit from the fee.

The imprecise basis for determining the fee may be contrasted with the methodology employed and described in the *Russ* case, *supra*, or that employed in the *J. W. Jones* case, *supra*. There the municipalities involved carefully computed the costs that would be incurred by the new developments in question and allocated them to the new development. In the *Russ* case, the transit fee was tied to the square footage being added by the new development with the consequence of increased population placing a heavier burden on public transit. In the *Jones* case, the development costs were confined to a newly developed area. In both cases the public agencies met their burden of showing that a valid method had been used for arriving at the fees in question, one which established a reasonable relationship between the fee charged and the burden posed by the development. Such was not the case here.

## III.

■ We asked the parties if the ordinances as enacted were overly broad. Plaintiff asserts that they are and we are compelled to agree that the Fire Hydrant Fee Ordinances, as they presently read, *do not* contain language which limits the use of the fire hydrant fees and the fund established by the

ordinances to solely those installations and repairs necessitated by new development, although such limitation is mandated by the California Constitution.

City argues that the ordinances are being interpreted by City officials "as if" they contained the limitation that the fees collected in the fund are to be used only to meet the burden placed on the public by new development. The Justis declarations submitted to the trial court did *not* adequately or precisely state that the funds were only to be spent on new development but tied the expenditure to the fire protection plan which contains very broad provisions. In the record there is evidence that City plans to attribute the cost of replacing a 97-year-old water main to plaintiff Bixel's presence on 7th Street, *although discovery established that the water main should have been replaced 47 years ago.* We are not persuaded that City's administrative interpretation of the ordinances would provide the safeguard envisioned by the voters when they enacted Proposition 13. Nowhere within the ordinances, or in the new municipal code section or the administrative code section has this court found adequate words of limitation.

We recognize that the situation confronting the drafters of valid ordinances in this area is not without substantial difficulty. We understand, as did the trial judge, that a developer may, by the presence of his project in City, not only necessitate new installations but may create a situation where upgrading of installations already in place may be required to maintain an adequate level of public service for everyone. How to allocate between the old and the new is difficult but is mandated by the California Constitution. The 97-year-old water main on 7th Street referred to in this litigation is a case in point; to what extent should a new developer pay for replacement of a water main that admittedly had a life span of 50 years and thus should have been replaced by City 47 years ago?

As plaintiff Bixel has pointed out, this case is not about the wisdom of City's policies or about the obvious need for the funding by City of sophisticated fire protection in the post-Proposition 13 era. Our task is to determine whether City's legislation meets the constitutional mandate, and we find it does not. We hold that the Fire Hydrant Fee Ordinances do not contain language embodying the required constitutional safeguards which must be employed in fashioning a valid development fee, and are constitutionally invalid for that reason. The trial court should have awarded summary judgment to plaintiff Bixel as a matter of law, and ordered that the fire hydrant fee paid under protest be refunded to Bixel.

In view of our disposition, we do not address plaintiff's contention that exaction of the fee constituted a taking in violation of the due process guaranties of the federal and state Constitutions.

## Disposition

The judgment is reversed. Appellant shall recover its costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 2, 1990. Mosk, J., and Broussard J., were of the opinion that the petition should be granted.